## PINCKARD'S DISTRIBUTEES *vs.* PINCKARD'S ADMINISTRATORS.

1. The statute which authorizes the slaves and servants of which a decedent was possessed at the time of his death, and which were employed in making a crop, to be continued on the plantation in his occupation at the time of his death, until the last day of December following, embraces all the plantations belonging to him and cultivated by him at that time.

2. Under this statute an administrator is authorized to furnish the widow and children of the decedent with all things necessary to their comfortable support, according to their respective condition and wants ; but he must keep an account against each, to be charged upon his respective distributive share ; and such expenses only as are indispensable to the cultivation of the plantation, are a charge upon the estate, to be deducted from the proceeds of the crops.

3. The domestic servants employed about the household at the time of the decedent's death, may be allowed to remain with his family until the end of the year, for their use, free of charge ; the town residence of the family, and the plantation a few miles distant, constitute but one establishment.

4. The decedent having died in February, after he had commenced planting, his administrator kept up the plantation during the year, and made a crop : He was held entitled, on final settlement, to a credit for his expenses in going to Montgomery to sell the cotton belonging to the estate.

5. Two day's services of an auctioneer, in selling the property of the estate, held a proper charge against the estate on final settlement.

6. An administrator is entitled to a credit for reasonable counsel fees paid for prosecuting and defending the interests of the estate.

7. Also, to reasonable counsel fees for services rendered on final settlement with the Probate Court, although exceptions were sustained to several items in his accounts and vouchers.

8. Expense of repairs to household furniture belonging to the estate is properly

allowed, when the value of the furniture is thereby increased to that extent.

9. Counsel fees paid for prosecuting the widow's right to dower, and her account for medical services rendered after her husband's death, are personal charges against her, and not against the estate.

10. Counsel fees paid for guardian *ad litem* for the minor heirs, are a personal charge against them, and not against the estate.

11. Five per cent. on the amount of the estate held a reasonable allowance to the administrator, where he had managed the plantation for nearly a year, and raised a crop ; the value of the estate being about $25,000.

ERROR to the Court of Probate of Chambers.

ON the final settlement of the defendants' administration on the estate of Peyton Pinckard, deceased, the distributees objected to the allowance of several items in their accounts and vouchers ; and their objections having been overruled, they excepted to the several rulings of the court against them, and now assign for error :

"1. The matters set forth in the bill of exceptions, as specified in the following items : 1st, in refusing to charge the administrators with the hire of negroes unaccounted for, to-wit : Lambert, Randall, woman Amy, girl Amy, and girl Julia, and twenty head of stock hogs unaccounted for ; 2nd, in allowing vouchers presented by E. G. Richards, numbered 2, 9, 24, 26, 29, 30, 31, 32, 33, 34, 35, 43, 44 ; 3rd, in allowing vouchers presented by Carothers and wife, numbered 3. 8, 15, 20, 22, 25 ; 4th, in allowing commissions upon the aggregate amount of the estate, at the rate of five per cent.

"2. The court erred in rendering the decree : 1st, in the allowance of ten dollars paid to G. W. Gwinn, attorney's fee, for representing the guardian *ad litem* for the minor heirs ; 2nd, in allowing the administrators the sum of $1182 48, it being five per cent. on the aggregate amount of said estate."

The evidence with regard to these items, as set out in the bill of exceptions and the decree of the court, is, in substance, as follows : The decedent died on the 2nd day of February, 1850 ; at the time of his death he resided, with his family, in the town of La Fayette, and had a plantation six miles distant in the county; he had employed an overseer for the year 1850, who was at that time on his plantation, preparing to make a crop ; on the 11th day of March, 1850, letters of administration on the estate of said decedent were granted to Martha E.

Pinckard, the widow, and E. G. Richards. It was proved that the boy Lambert, who was a blacksmith, had been hired out by the decedent, for the year 1850, to a carriage-maker, for the sum of $175, on condition that he should be found to suit the business : the boy was in the hirer's possession, on trial, at the time of the decedent's death ; but a few days afterwards he was returned to the widow, before letters of administration were granted on the estate ; after the grant of letters of administration, the administrator, Richards, made several efforts to hire out said boy for the balance of the year, but failed ; the boy was, however, hired out several times during the year, by the day, the sums received for such hire amounting to $92 47, with which the administrators charged themselves. On this proof, the court refused to charge the administrators with said sum of $175 for the hire of said boy.

It was shown, also, that the decedent had hired out the boy Randall, who was a blacksmith, for the year 1850, for the sum of $150, to one Cole, who was a carriage and wagon maker ; but the hiring was on condition that the boy would suit him ; said Cole took the boy on trial, and was to pay for the time he had him, if the boy did not suit ; three days after the decedent's death Cole returned the boy to the widow, and gave her his note for $9 37 for the time he had kept him ; the boy was then placed on the plantation, to do the smith's work, and was kept there during the remainder of the year ; it was shown that the boy was worth about $15 per month to work at his trade, but was not worth so much on the farm. The administrators charged themselves with the amount of the hire received from Cole, and the court refused to charge them with said sum of $150.

The woman Amy was hired out by the widow, about the middle of February, for the balance of the year 1850, to one Callahan, for $45, for which sum he gave his note, payable to Richards, the administrator ; said Amy became sickly in June, and proved to be pregnant, and thereupon said contract was rescinded, and the woman returned to the administrators, who kept her the balance of the year, during which time she gave birth to a likely child. The administrators charged themselves with the sum of $22 41, received from said Callahan for the hire of said woman, and the court refused to charge them with any further sum.

The girls Amy and Julia, who were employed about the house before the decedent's death, one as a nurse, and the other as a house girl, were kept in the family during the balance of the year; "it was further in evidence, that five other negroes were kept by the administratrix at the residence in town, of the following description: a cook woman, an old negro man about seventy years old who tended the garden, an old man who was unable to take care of himself, two small girls six or seven years old, and a small boy less than the girls; it was also shown that the decedent's family consisted of his wife and five children, the youngest being an infant. The court refused to charge the administrators with anything for the hire of Amy and Julia.

As to the twenty head of hogs unaccounted for, the proof was, that six or seven died during the year, and six or seven more were killed and eaten by the family; that previous to the sale, the overseer hunted up all he could find, and they were sold; and that the number returned in the inventory was about twenty more than were accounted for in the return of sales. The court refused to charge the administrators with the value of those which were missing.

Voucher No. 2 was a receipt for $12, paid by the administrator for four barrels of corn, which was purchased by him and used on the plantation; and the proof was, that there was no other corn on the plantation at the time of the purchase.

Voucher No. 9 was a receipt for $10 paid to one Towles, who was proved to be a superior salesman, for two days' services in selling the property of the estate.

Voucher No. 24 was for $12 70, money paid out by the administrator for travelling expenses to Montgomery, to sell the cotton belonging to the estate.

Voucher No. 26 was a receipt for $27 24, the amount of an account paid by the administrator; "it was in evidence that the items mentioned in said voucher were purchased by the administratrix, after the decease of Pinckard, for the use of the family, in the town of LaFayette, and that they were such articles as were usually purchased by families in like condition."

Voucher No. 29 is a receipt for $30 50, the amount of a store account for several articles of clothing; but the bill of exceptions does not state what evidence was offered in connection with it.

Voucher No. 30 is a receipt for $11 50 paid for three barrels of corn ; and the evidence was, that one half of the corn was used on the plantation, and the other half by the family at their residence in town, and that they were out of corn at the time it was purchased.

Voucher No. 31 is a receipt for $19 61, the amount of a store account ; and the evidence was, that the articles charged were such as are usually bought for negroes, and were applied to the use of the negroes at the residence in town and on the plantation.

Voucher No. 32 is a receipt for $71 92, the amount of a store account, some of the articles having been bought in the decedent's lifetime ; and the evidence was, " that the articles purchased by the administrator, after the 2nd of February, 1850, were used for the white children and negroes, at the residence in the town of La Fayette, except the thread which was made into cloth for the use of the negroes."

Voucher No. 33 is a receipt for $83 07, the amount of an account for groceries ; " the evidence was, that some bacon was sent to the plantation, for the use of the negroes, and the balance was used by the administratrix and the family in the town of La Fayette."

Voucher No. 34 is a receipted account for $80, for repairs on a barouche ; and the evidence showed, that $80 was a reasonable price for said repairs, that the barouche was not worth more than $50 without them, and that it sold for $141.

Voucher No. 35 is a receipted account for $30 14 ; " the evidence was, that the articles were such as are usually purchased by families in like condition to that of the deceased, and were used by the family, and in clothing the negroes on the plantation ; that the amount of clothing purchased was less than is usually found necessary to clothe the same number of negroes, and that the negroes were all well clothed when delivered to the heirs."

Voucher No. 39 does not appear in the bill of exceptions ; but it is stated that " the evidence showed that Richards, the administrator, and Presley, his copartner, were attorneys, and that the amount charged was not more than a prudent administrator would have been authorized to pay for such services."

Voucher No. 43 is a receipted account for $125, paid to

Messrs. Richards & Presley, attorneys at law, for professional services rendered to the estate in an attachment suit at law and another suit in chancery ; " the evidence was, that the attorneys performed the services, and that said services were necessary ; that the fees charged were reasonable ; that the services of a competent attorney or solicitor in chancery could not have been procured for less ; and that the amount paid was such as a prudent administrator would have been authorized to pay."

Voucher No. 44 is an allowance of $25 to the administrator " for counsel fees on final settlement of said estate ;" and it is stated that " there was no evidence in support of this voucher, further than the statement of the administrator, that, in consequence of the litigation by contestants, he was compelled to employ counsel, but for which it would have been unnecessary; that he had presented no such voucher on filing his account, but now asked allowance for said sum."

Of the vouchers presented by Carothers and wife, (Carothers having intermarried with the widow,) the first to which exception was taken is a receipted account for $6 45; and the evidence was, " that the articles were purchased by the administratrix after the death of Pinckard, and were used by the family of the deceased at the residence in the town of LaFayette." In support of voucher No. 8, the same evidence was given as in support of No. 3.

Voucher No. 15 was a receipted account for $61 75, for furniture and repairs, while " the evidence showed that the repairs increased the value of the property, and that all the articles were sold at the sale in their improved condition, and the administrators charged themselves with the amount said articles sold for."

Voucher No. 18 is a receipt for $4 00 paid for a barrel of flour, which was bought by the administratrix, and used by the family at their town residence.

Voucher No. 20 is a receipt for $6 00, for making mourning bonnet, dress, &c., for the widow.

Voucher No. 22 is a receipted account for $25, for printing 200 copies of "Appeal to the United Christian World ;" it was in evidence that the contract for this printing was made by Mrs. Pinckard, in the lifetime of her husband ; that the account was charged to her, and was never presented to said Pinckard in his lifetime.

Voucher No. 25 is a receipted account for $10, for medical services rendered to Mrs. Pinckard after the death of her husband, and the evidence showed that the services were rendered.

The court allowed all these accounts as charges against the estate, and the distributees excepted to the allowance of each item. The further sum of $10, paid to the attorney for the guardian *ad litem* of the minor heirs, was allowed; and the administrators were allowed, "for commissions and their trouble in superintending the estate," the sum of $1182 48, being five per cent. on the amount of the estate.

P. M. ALLISON and M. ANDREWS, for plaintiffs in error.

RICHARDS & FALKNER, *contra.*

PHELAN, J.—The correctness of several of the items in the accounts of the administrators, allowed them on final settlement, (see the statement of the case,) will depend upon the construction to be placed on the statute.—Clay's Dig., p. 196, § 19. That statute is in these words :

"If any person shall die after the first day of January, the servants and slaves of which he was possessed, &c., and which were employed in making a crop, shall be continued on the plantation in the occupation of the decedent at the time of his death, until the last day of December following, and then delivered to those who shall have a right to demand the same; and their crops shall be assets in the hands of the executors and administrators, subject to debts, legacies and distribution; the levies and taxes, their tools, the expense of feeding them and their families to that time, and delivering them well clothed, being first deducted."

Two questions arise here for our determination : 1st. Does this statute embrace any other than the plantation actually occupied as a residence by the decedent at the time of his death ? 2d. Does it intend that the family at large of the decedent shall be supported out of the proceeds of the crops, or only the slaves, &c., engaged in making the crop ?

We think the remedial nature of this statute requires that we should construe the words, "the plantation in the occupation of the decedent at the time of his death," to mean any plantation, and all the plantations, then belonging to him and culti-

vated by him. The main object evidently was, whenever a man died, who was engaged in planting, and who had made his plans and arrangements for the year, to let the business go on to the end of the year as he had projected it. This was supposed, no doubt, to be for the best interest of all concerned, and made the time for breaking up the plantation conformable to the general habits and customs of the country. This object, then, would embrace as well a plantation cultivated by him on which he did not reside, as one on which he did, and we must construe the statute accordingly; for both can be lawfully and properly said to be in his " occupation at the time of his death."

2. Was it the intention that the family of the decedent generally should be supported out of the proceeds of the plantation, or plantations, as the case may be, or only the slaves, stock, &c., indispensably necessary to the working of the crops?

The law evidently contemplates that the administrator should keep an account of *plantation expenses proper*, that is, such as are indispensable to its cultivation, and that this should be deducted from the proceeds of the crops, and the *net proceeds* only to be assets for distribution, &c. We think, however, that there can be no question that the law will justify an administrator in all such cases, (when the estate is not insolvent,) in furnishing the widow and children all things necessary to their comfortable support, according to their respective condition and wants, to the end of the year ; but then he would be bound to keep an account against each, to be charged upon their respective distributive shares. Thus, bacon and corn for the plantation, negro clothing, &c., would be a charge upon the estate, to be deducted from the proceeds of the crops ; but the subsistence of the family in town, the mourning suit for the widow, and the like, must be charged to the respective distributees for whose benefit the expense was incurred, and deducted from their respective distributive shares.

The decision of the court refusing to charge the administrators with the hire of slaves Lambert, Randall, and woman Amy, was correct, according to the proof. From this it appears, that they acted with reasonable care and prudence, and in good faith, in each instance ; and it would not be proper to charge them with hire, as for a conversion. In the case of the woman Amy,

in all probability, the estate was benefited greatly beyond the value of her hire, by the course which was pursued.

Another question arises, as to the girls Amy and Julia, for whom hire is claimed. These, it is shown, were a part of the menial or domestic servants of Peyton Pinckard at the the time of his death : the one a nurse, and the other a house girl. There was six other slaves, old and young : a cook woman, an old man gardener, a very old helpless man, and three small children, composing the household slaves of decedent at the time of his death ; and for these no claim is made. What does the statute intend with respect to the menial or domestic servants of the decedent ? We think it is clear, that when a man who resides on his plantation, dies, the statute intends that the household or domestic servants shall be left, until the end of the year, with the family, for their use, as a part of the plantation. The words of the statute, " *servants* and *slaves*," clearly point to a distinction in the mind of the law-makers ; and if this be not it, —the known distinction in slaveholding States between *household servants* and what we call *field hands*—then we can conceive of none in our country. But, if the law authorizes this when the party resides on his plantation, the interpretation which we have already given to the statute will extend the same privilege to his family, although they may reside a few miles distant, as in this instance ; the family residence and the plantation a few miles distant being, for most purposes, with us, but one establishment. If, then, these were domestic servants, the law, allows them to remain with the family of the decedent, until the end of the year, for their use, and without charge. The decrepit old negroes, and the helpless young, must have a home, as well as the white family, in our country ; and the law must be supposed to have respect to the condition and wants, the duties and obligations, of both portions of our population.

As to the few stock hogs that were missing at the end of the year, the proof shows that they may have died, or been lawfully consumed by the family ; the court properly refused to charge the administrators with them.

The expenses of the administrator, Richards, in going to Montgomery to make sale of the cotton, and the two days' services of the crier at the sale, were properly allowed.

The sums paid out for the services of legal counsel, in

defending the interests of the estate, having been shown to be necessary, and the charges themselves reasonable, were properly allowed.

There is one charge allowed the administrator for the assistance of counsel in conducting his settlement with the Probate Court. The allowance of counsel fees to the administrator, in such cases, must depend upon the circumstances of the case. If the administrator is met with exceptions to his account and vouchers, or to one or more important items, there seems to be no reason why he should be denied the assistance of legal counsel, even though the payment is to come out of that fund which is ultimately to go to his contestants. He is a trustee; and, if he acts in good faith, he should be protected. We see no other safe way, than to leave the allowance of counsel fees to the sound discretion of the probate judge, in such cases, (for the whole is transacted under his eye,) with the right in this court to control any exercise of such a power as may seem to call for it. We cannot see but that the allowance here was properly made. A great many exceptions were taken to the account and vouchers of the administrator, some of which have been sustained here; but upon the whole, it is evident that the administrators were in condition to need legal counsel and assistance fairly to discharge their trust. The charge seems to have been reasonable, and will therefore be allowed.—See Bendall's Adm'rs v. Bendall's Heirs, at this term.

The expense of repairs done to the barouche and to the furniture, which were afterwards sold, the court might allow, if satisfied from the proof that the value of the articles at the sale had been enhanced by these repairs to the full extent of such expense; and this seems to have been the case.

The sum paid out for printing two hundred copies of the "Appeal to the United Christian World," is not a proper charge against the estate. There is no satisfactory proof that it was done for, or with the approbation of, the decedent.

The counsel fees paid for prosecuting the right of dower of the widow, is a charge personal to herself; so, also, is her medical bill after the decease of her husband. The fee allowed for the attorney for the minor heirs, is a proper charge against them only.

Considering the extent of this estate, and that the plantation

was kept up and managed for nearly a whole year after the death of the intestate, we do not think the amount allowed the administrators, as " commissions" and for " their trouble," at all unreasonable. The usual rule of a per cent. on the receipts and disbursements only, would not meet the just demands of a case like this.

These observations, together with the general principle already laid down, which will be found applicable to most, if not all, of the vouchers not particularly noticed above, will be sufficient to guide the court below in the future progress of this case.

For the error in allowing such charges as are said above not to have been properly allowed, and for allowing the others in the form in which they were presented, the decree of the court below is reversed, and the cause remanded.