## PICKENS' ADM'R vs. PICKENS' DISTRIBUTEES.

[PARTIAL SETTLEMENT OF ADMINISTRATOR'S ACCOUNTS.]

1. *Keeping estate together under order of court.*—When a decedent's estate is kept together under an order of the probate court, (Code, §§ 1902–09,) the administratrix is not authorized to keep up the family establishment, and to support the family, at the expense of the estate ; but the reasonable expenses of the family should be apportioned among the several distributees separately, and the minor children may be charged with the expenses of board, clothing and education, in a style corresponding with their fortune, social position, and expectations in life.

2. *Same.*—In such case, the administratrix is entitled to a credit against the estate, for reasonable expenses incurred and paid by her in procuring moral and religious instruction for the slaves belonging to the estate, as the intestate had been accustomed to do in his life-time.

3. *Attorney's fees allowed as credit to administratrix.*—The reasonable compensation of an attorney, for services rendered by him to an administratrix on an annual or partial settlement of her accounts, is a proper charge against the estate, although no controversy was raised on any item of her account.

APPEAL from the Probate Court of Greene.

In the matter of the estate of Samuel Pickens, deceased, on the annual settlement of the accounts and vouchers of Mrs. Mary G. Pickens, the administratrix. All the assignments of error are founded on the rulings of the probate court to which exceptions were reserved by the administratrix, and which are thus stated in the bill of exceptions:

"The administratrix proved, that her intestate died in

Greene county, Alabama, in July, 1856; that letters of administration on his estate were granted to her at the September term of said probate court, 1856; that afterwards, under and by virtue of section 1902 of the Code of Alabama, said probate court granted an order, on her application, for keeping said estate together for a period not exceeding ten years; that said estate consisted of three valuable plantations and slaves, and was free from any embarrassment from debt; that the income from cotton crops raised annually on said plantations was about $18,000; that the plantations were separate and distinct settlements; that the intestate, with his family, resided together on one of said plantations, which was about eight miles in the country, and distant from any town or village; that the intestate's distributees, whom he left surviving him, were his widow, Mrs. Mary G. Pickens, and six children, to-wit, Samuel, about fourteen years old, James, about ten years old, Mary, about eight years old, Louisa, about six years old, Israel, about four years old, and William, about two years old; that the intestate and his family moved in the very best society, and lived in comfort and luxury, in the style and condition of people of wealth; that the intestate provided for his family in the most liberal manner, and was accustomed to employ a missionary to preach to his servants on the Sabbath, on two of his plantations, which were about six miles distant from each other; that in July, 1857, the administratrix and the children left their home, on a trip to the springs in Virginia, and were absent until the latter part of the month of October; that she took with her, as a protector for the family, a gentleman who was a private tutor in the family at that time, instructing the three oldest children, and also two servants to wait upon the family during their absence from home; and that it was not unusual for persons, of the rank and condition of the intestate and his family, residing in that portion of Alabama, to leave their homes during the summer and fall months, and to travel to the watering places in Alabama and other States, and especially to the springs in Virginia, for health and for pleasure. It was

proved, also, that the intestate, during his lifetime, had hired a negro woman, Malvina by name, who was an excellent nurse, and who had been in the family, in that capacity, for several years before the death of the intestate; also, that in the year 1858, Samuel and James, the two eldest sons, were sent to school to 'Greene Springs,' a distance of twelve or fourteen miles from the family mansion, where they paid their board and tuition as a separate charge against each, and that they were at the family mansion during that year, up to the time of this settlement, only for a few weeks, or on an occasional visit of a day or two; also, that the administratrix, with the other children, Mary, Louisa, Israel and William, continued to reside at the family mansion, and lived in the same style and condition in which they were accustomed to live during the life-time of the intestate. The administratrix proposed, in the progress of the settlement, to charge herself with the sum of $18,785 41, as money received from the sale of the cotton crop for the year 1857, and with about $2,000 more for moneys collected from other sources; and asked the court to allow her a credit, as for moneys disbursed by her on account of the estate, for the following different sums, as shown by vouchers Nos. 190, 191, 195, 201, 208, 223, and 248, which are as follows," &c.

Voucher 190 is a receipted account for $6 26, including interest, for four pounds of green tea bought by the administratrix on the 26th June, 1857. Voucher 191 is a receipted account for $69, including interest, for molasses, sugar, tobacco, oysters, apples, bananas, oranges, and pine apples, bought by the administratrix on the 23d December, 1857. Voucher 195 is a receipted account for $1107 17, including interest, for bacon, rice, sugar, and brandy, bought by the administratrix during the year 1857. Voucher 201 is a promissory note for $65, given for the hire of the negro woman Malvina during the year 1857, with a receipt thereon endorsed. Voucher 208 is a receipted account for $140, in favor of J. W. McCann, for services rendered by him in preaching to the slaves on two of the intestate's plantations, on two Sabbaths of

each month during the year 1857. Voucher 123 is a receipted account for $11 27, for rice, sugar, tea, and cheese, bought by the administratrix during the year 1857. Voucher 248 is a receipted account for $295 78, for bagging, rope, and carpets, bought by the administratrix on the 19th November, 1858. "The administratrix proved, that all of the articles specified in said vouchers were ordered by her, and had been received and used in supplying the table and keeping up the establishment. The court rejected and disallowed each of said vouchers, on motion of the guardian *ad litem* of the minor children; and the administratrix excepted."

"The administratrix asked the court to allow her a credit for $1034, which amount she asked might be charged against the said Samuel and James on their separate accounts, one-half to each, as so much money paid by her for their expenses on the said trip to the 'Virginia Springs;' and proved, that this was their proportional part of the expenses of said trip, including and charging upon them the entire expenses of the private tutor. The said Samuel and James, by their guardian *ad litem*, objected to the allowance of this item as a credit, and the court sustained their objection; to which ruling the administratrix excepted.

"The administratrix then asked the court to allow her a credit for $1240, which amount she asked might be charged against the said Mary, Louisa, Israel and William, one-fourth to each, on their separate accounts, as so much money paid by her for their respective expenses on the said trip to the 'Virginia Springs;' and proved, that this was their proportional part of the expenses of said trip, including and charging them with their proportion of the expenses of said two servants above mentioned. The said Mary, Louisa, Israel and William, by their guardian *ad litem*, objected to the allowance of this item against them respectively, and the court sustained their several objections; to which the administratrix excepted.

"The administratrix further proved, that she had paid eighty dollars to an attorney-at-law, for making out her account, and attending a previous settlement heretofore

made by her; and asked to be allowed a credit for the same on her account. It was proved, that the services of said attorney were reasonably worth that sum, but that no contest or controversy was raised on said settlement. The infant distributees, by their guardian *ad litem*, objected to the allowance of this item, and the court sustained their objection; to which the administratrix excepted."

The assignments of error embrace the rulings of the court above stated, to which exceptions were reserved.

J. D. Webb, for appellant.—It was the purpose of the legislature, by the provisions of the statute, (Code, §§ 1902–09,) to preserve the family relation; to keep the estate together, to be worked in common for the benefit of all parties interested; to keep up the household, and provide a home for the widow and children; to dispense with the office of guardians for the minor distributees, and to devolve on the representative of the estate the duties and responsibilities of providing a support for them; and the expenditures so made are to be treated, on final settlement, as advancements for the distributees. Pinckard v. Pinckard, 24 Ala. 257. If such was the intention of the legislature, the homestead can only be provided, supplied and kept up by the funds of the estate. It is for the common good—the place to which all may resort, and enjoy the benefits thereof; and the expenditures should not be confined to just so much as may be required by the actual wants and necessities of the parties, but should include such a liberal provision for the hospitalities of the mansion as would be suitable to the rank, station, and condition in life of the family.—24 Ala. 257; 13 Ala. 667.

In carrying on the business of the plantation, the administratrix is not confined to such expenditures as are indispensable to the production of a crop. Whatever would be for the good of the estate, for the reasonable comforts of the slaves, and for their welfare, should be allowed. The only question that could arise on voucher 208 was, whether it was a reasonable sum to be paid for the services rendered.—24 Ala. 250; 17 Ala. 175.

If the family mansion is to be inhabited by the family, and was intended to be kept up as a home for them, not only should it be kept in repair, but such reasonable additions of furniture and comforts should be provided, out of the assets of the estate, as the increasing wants of the family may demand. The articles thus purchased would become the property of the estate, and, on final distribution of the estate, would be sold and distributed like other personal property.—24 Ala. 250; 32 Ala. 256; 17 Ala. 175.

The expenses incurred on the trip to the Virginia springs were properly chargeable against the children separately. The administratrix was the only person to judge of the wants of the children, and of the propriety of the expenditures.—18 Ala. 246; 24 Ala. 250.

It was to the interest of the distributees that the accounts and vouchers for the settlement should be properly made out, and that the settlement should be had according to the provisions of the statute; and if the administratrix required the advice and assistance of an attorney, to enable her to do so, the expense should be a charge against the estate.—24 Ala. 250. That no objection was made to her accounts and vouchers, was probably owing to the fact that she acted under the advice of an attorney.

S. F. HALE, contra.—The ordinary duties of an administrator are, to collect the assets, pay the debts of the estate, and make distribution. The main question in this case is, how far are these duties changed by an order of the probate court, authorizing the estate to be kept together under the provisions of the Code. It is insisted for the appellees, that the statute does not authorize the personal representative to charge the estate for articles of family supply, and was not intended to preserve the family relation. Section 1903 provides, that the widow's dower must, in all cases, be reserved. Section 1906 provides, that separate accounts must be kept of the amount of money expended for each distributee. Section 1910 provides, in effect, that each legatee or distributee, on

becoming of age, is entitled to his or her share of the estate. It surely was not the intention of the legislature to allow the widow her support out of the estate, when her dower.is reserved to her; and it would be certainly unjust to allow the widow and a portion of the children to be supported out of the estate, while the others were off at school, and their support made a separate charge against them respectively.

The same objections apply, with additional force, to the allowance claimed for the hire of the nurse and the purchase of the carpet; with the additional objection, that these expenditures were in no sense necessary for the use of the family.

The allowance claimed for missionary labor among the slaves, however it may commend itself to our christian philanthropy, is not authorized by law. Slaves are regarded by law as property, and the administrator has to deal with them only in that capacity. Providing for their moral wants does not add to their value as property, and is not within the scope of his duties. If any amount can be allowed for such expenses, no limit can be fixed to the amount which may be thus expended, as all religions are entitled to equal protection and encouragement under our laws.

It was not shown that the pleasure trip to Virginia was calculated to improve the children morally, physically, or intellectually; and the expenses cannot be sustained, as a charge against the children, upon any legal principle.

It is not denied that an administrator is entitled to a credit for money paid out for the services of an attorney, in all cases where such legal services are required by the estate. But it is insisted, that where there is no controversy, and no difficulty is shown, it is his personal duty to make out his account for an annual settlement, and he cannot have it made out by an attorney at the expense of the estate.

STONE, J.—The estate of intestate, in this case, was kept together by order of the probate court, under section 1902 of the Code. The various exceptions and assign-

ments of error render it necessary that we shall construe sections 1902–09 of the Code, so far as they authorize expenditures for estates thus kept together. We premise, that no question seems to have been raised touching the conduct of the administration during the year 1856, in which year Mr. Pickens died.—See Pinckard v. Pinckard, 24 Ala. 250; Code, § § 1900, 1901.

The language of section 1900 of the Code is somewhat different from that of sections 1902, *et seq.* The purposes of the sections are also different. Section 1900 takes the place of the act of 1826, Clay's Dig. 196, § 4. It operates only during the year of decedent's death. The act of 1826 was considered in Pinckard v. Pinckard, *supra ;* but we need not, and do not, now announce whether section 1900 of the Code will receive the same construction.

The sections of the Code, which the wants of this case require us to construe, take the place of the act of 1835. Clay's Dig. 198. The most important question presented by this record, may be thus stated : When an estate is ordered to be kept together under section 1902 of the Code, is the family establishment to be kept up, and the family to be supported, at the expense of the estate ? Or are the expenses of the family a separate charge against each distributee ?

The legislation on this subject is somewhat meagre, and we are aware that some difficulties and embarrassments must grow out of any solution we may give of the question. Still we feel constrained to hold, that section 1902 of the Code, and those following on the same subject, furnish no authority for maintaining the family of the deceased out of the assets proper of the estate ; nor should the family establishment be kept up at the expense of the estate. Some of the reasons which lead us to this conclusion are the following :

1. The entire absence of express statutory authority for such proceeding.

2. Section 1903 of the Code declares, that the dower of the widow must, in all cases, be reserved. This, in many cases, would deprive the estate of the use and occupation of the homestead, and would secure the dwelling-

house to the individual use of the widow. If her dower should be so laid off as not to include the dwelling-house, then the opposite doctrine would secure to the widow a home and support at the expense of the estate, in addition to the use and benefit of her dower interest, already allotted to her.

3. Section 1906 of the Code requires, that separate accounts shall be kept of moneys appropriated and expended for each distributee. This repels the idea of a general expenditure.

It results from these principles, that no portion of the expenditure for the family, either in the year 1857 or 1858, was a proper charge against the collective estate. This principle excludes from the general account expenditures for furniture, provisions, luxuries, servant hire, and every outlay which was not for the use of the plantation. But, inasmuch as the personal representative of the estate, in a case like the present, (and in the absence of guardians appointed for the minor distributees,) performs many, if not most of the functions of a guardian, the administratrix was authorized to supply board, clothing, education, &c., to the minors, in style corresponding with their fortune, social position, and expectations in life; and such supplies would be proper charges against each individual distributee. No absolute scale of expenditures can be laid down. This must depend on the fortune of the minor. It may, however, correspond with what ordinarily prudent persons, of similar fortune and social position, expend in the support, and intellectual, moral and social training of their own children.

Mr. Pickens left an ample fortune. His children were all of ages which rendered it peculiarly proper that a mother's care and watchfulness should be over and around them. Save the intervals when it was necessary for the older children to be from home at school, no place was so appropriate or so secure for their moral training, as the home and society of their mother. For the enjoyment of that home and its benefits, it is proper that their several distributive interests shall be charged with a sum which shall remunerate her for the outlay and expense she may

have incurred on their account; and this outlay and expense will not be unreasonable, and should not be abated, unless it transcend the reasonable expenditures of ordinarily prudent heads of families, having similar fortunes. If the tender years of some of the children rendered it proper to have the services of a nurse of rare and desirable qualifications, the administratrix was authorized to procure such nurse, provided she did not pay an unreasonably high price for the same; and the outlay would be a proper charge against the children, for whose benefit the nurse was procured. The same rule will apply to the case of the private tutor.

We have spoken above of the benefits to the children of the presence and influence of their mother. It cannot be expected that a lady, of the fortune which Mrs. Pickens has, will always remain at home. The testimony in the record, as well as our own experience, informs us that persons thus circumstanced visit watering places, and other retreats for health and recreation; and we cannot say that the children as well as the mother would not probably be benefited by such visit. It cannot be affirmed that an occasional summer excursion, even to the Virginia Springs, such as is described in this record, is an unreasonable outlay for persons having the fortunes which these children are shown to have. This charge should have been properly apportioned among the children.

What we have said above will furnish a guide for a future settlement. We may add, that we find no item of outlay or expense, which, in view of the value of the estate in Mrs. Pickens' hands, seems to be unreasonable or prodigal on her part. While it is not proper that the household expenses shall be apportioned among the several inmates, *per capita*, still it is eminently proper that the children, for their maintenance, shall be charged on a scale graduated by the style and quality of living in the family, unless, in so doing, a heavier expenditure is incurred than is usual with families similarly circumstanced. It being fit and proper to train the children up in the circle, social and intellectual, in which their fortunes will justly entitle

them to move, it is but just that their several fortunes shall bear the burden of these advantages.

[2.] The charge made by the administratrix for missionary or religious services, procured for the slaves of the estate, was rejected. We do not assent to the proposition, that the administrator deals with the slaves of the estate, only in their character of property. Though they are property, they are intelligent beings, and under moral accountability. The master, or whoever stands in his place, is morally bound to furnish to this dependent and subject class such moral and religious instruction as is adapted to its political status. Such instruction, properly directed, not only benefits the slave in his moral relations, but enhances his value as an honest, faithful servant and laborer. Reasonable compensation for such services, when furnished and paid for by the administrator, becomes a proper charge against the estate.

[3.] In the cases of Pinckard v. Pinckard,(24 Ala. 250,) and Bendall v. Bendall, (ib. 295,) the question of compensation to an attorney, for services rendered the administrator in his settlements, was considered. In each of those cases, there was contest as to some of the items. This court said, " If the administrator is met with exceptions to his account and vouchers, or to one or more important items, there seems to be no reason why he should be denied the assistance of legal counsel." Neither of those cases presented the question, when no exceptions were filed. The present record raises this direct question.

Every administration, even in its simplest form, casts upon the incumbent the performance of some duties, for the correct performance of which some knowledge of the law is necessary. The law, in adjusting the preferences in the right to administer on estates, or to execute wills, has not declared that legal knowledge is one of the qualifications. So far from this being the case, the widow, who is certainly not presumed to be learned in the law, stands first in the list of preferred applicants. To deny to an administrator the right to have counsel, except when exceptions are filed, is to take from him, except at his own expense, the means of protecting himself against after

liabilities and losses, by proceeding correctly in the several stages of the administration.

Much of the severe and disastrous litigation in this State, in which estates and their representatives have been involved, may be traced to some error in what may be called the simple stages of the administration. It would be difficult to estimate the amount of loss, chargeable to what would be set down as slight errors. A little precaution, and considerate legal advice, would generally prevent these serious, and frequently ruinous consequences. We do not say that every step in the administration should be taken under legal advice. That might lead to too great expense. There are certain proceedings, however, which require accuracy. Inventories, orders to sell land and slaves, and accounts current for settlement, are of this class. In these stages, unless it appears that the representative has unnecessarily sought to charge the estate, a reasonable free for counsel should not be disallowed. Of course, the well-being of the estate, and the reasonable security of the administrator, should alone be regarded as justifying such expenditure. The claim for counsel fees should have been allowed.

Reversed and remanded.