# BENDALL'S DISTRIBUTEES vs. BENDALL'S ADM'R.

1. The allowance to an administrator of a credit for the cost of a tombstone erected over the deceased, must depend, in each case, upon the value of the estate and the desire of the deceased, as expressed by him orally or in his will. In a case where the estate amounted to about $8,000, and was bequeathed to collateral relations, the testator leaving neither widow nor children, the administrator was allowed a credit for $210, the cost of a marble tombstone, for which the testator had expressed a wish.

2. An administrator is not entitled on final settlement to a credit for counsel fees and cost paid by him in a chancery suit, (which he had instituted against the legatees to restrain them from proceedings in the Court of Probate to compel a partial settlement of his administration,) his bill having been dismissed for want of equity.

3. An administrator placed certain notes in the hands of his law partner for collection, who collected some of them by due course of law, filled up writs in other cases, (but never issued them, or docketed the cases in court,) and received the money from the debtors in all the other cases without suit. The court allowed him a credit for two and a half per cent. on the entire amount collected, for commissions paid to the attorney, and *it was held* no error of which the distributees could complain.

4. An administrator rightly allowed (*in this case*) a credit for $150, the amount of counsel fees paid by him to two attorneys for services rendered on his final settlement; the value of the estate being about $8,000, and the distributees contesting many of his accounts and vouchers, some of which were rejected.

5. Also, to five per cent. on the amount of his receipts as commissions, no wilful default or gross negligence being proved against him.

6. If an administrator wishes to discharge himself from the payment of interest, he should make the affidavit required by the statute when his account is stated by the court on the day of settlement; if the distributees are taken by surprise, the court may continue the cause, to give them an opportunity to examine into the facts and contest the affidavit.

7. The stating of an administrator's accounts is the act of the court; and to enable the Supreme Court to determine whether there was error in allowing any particular item, the bill of exceptions must set out all the evidence in relation to it which was before the primary court.

8. A testator bequeathed to his brother one-sixth part of the net proceeds of his estate, "to him and his heirs forever;" one-sixth to one of his sisters, "to her and her heirs forever;" one-sixth to the only daughter of a deceased sister, "to her and her heirs forever;" one-sixth to the five children of another deceased sister, "to them and their children forever;" one-sixth to another sister, "to her and her bodily heirs forever;" and one-sixth to the five children of his brother by his first wife, "to them and their heirs forever;" and the residue was "to be equally divided between my [his] heirs

heretofore named in the six separate divisions :" *Held,* that the legacies to the two sisters and brothers, they having died before the testator, lapsed, and went to the next of kin under the statute of distribution.

ERROR to the Court of Probate of Madison.

ON the final settlement of the estate of Jesse Bendall, deceased, by William H. Moore, his administrator, the legatees and distributees excepted to several rulings of the court, which they now assign for error. All these exceptions will be readily understood from the opinion. In relation, however, to the third exception, as to commissions paid B. T. Moore, an attorney at law, for collections, it should be stated, that the bill of exceptions expressly declares that the evidence therein set out " was all the evidence offered on this issue."

The testator, after directing his just debts to be paid, bequeaths to his brother, Isaac Bendall, several articles of inconsiderable value and one-sixth part of the net proceeds of his estate in money, " to him and his heirs forever ;" to his sister, Sally Anderson, " one-sixth part of the net proceeds that is not given away to others, to her and her heirs forever ;" one-sixth to the only daughter of a deceased sister, Elizabeth Zills, " to her and her heirs forever ;" one-sixth to the five children of another deceased sister, Judith Adams, " to them and their children forever, to be divided into five parts first only, and paid to each of them ;" one-sixth to his sister, Barbary Jones, " to her and her bodily heirs forever ;" and one-sixth to his said brother's (Isaac Bendall) five children by his first wife. The residuary clause is as follows : " I now leave all the remainder of my estate that is not heretofore given away, in cash and accounts, in the hands of my executors, to carry on my law suits, if there should be any, and all other business belonging to my estate unsettled, and their expenses to be borne out of the same money, if there should be enough ; and the net proceeds, after making a complete settlement, is to be equally divided between my heirs heretofore named in the six separate divisions, by my executors hereinafter named." Isaac Bendall, Sally Anderson and Barbary Jones having died in the testator's lifetime, the court held, that their legacies lapsed, and went to the next of kin under the statute of distribution.

C. C. CLAY, Jr., and J. W. CLAY, for plaintiffs in error :

1. The credit for moneys expended about the tombstone is unsustained by the will or bylaw. If an administrator is not allowed a credit for mourning, apparel, or other clothing furnished the widow and children of a deceased man, by how much stronger reason should the credit claimed be disallowed ?—Willis' Adm'r v. Heirs of Willis, 9 Ala. 334 ; Griswold v. Chandler, 5 N. H. 492. An administrator is limited, in his expenditures of the money of the estate, to its appropriate business—to the purchase of necessary articles that actually come to the use of the estate, or to payment for necessary services rendered it ; and this he must show affirmatively.—Savage v. Benham, 11 Ala. 55, 56 ; Phillips' Adm'r v. Thompson and Wife, 9 Porter 667. But if such a credit is allowable, it ought to be regulated by the station of the deceased in his lifetime, his style of living, and the size of his estate. The credits here claimed and allowed amount to $210 88—nearly 4 per cent. on the distributable assets of the estate. No evidence was offered in support of the credits, save the declarations of the testator, which were objected to, and were clearly inadmissible ; and, if admissible, they did not support the charge against the estate. If an administrator may exercise his discretion, or indulge his taste in such expenditures, he might exhaust the assets of the estate in erecting a statue or a mausoleum.

2. It has been expressly decided in Pennsylvania and South Carolina, that an administrator should not be allowed counsel fees on the settlement of his accounts, in a contest with the legatees.—Heister's Appeal, 7 Barr (Penn. R.) 455, 459 ; Villard v. Robert, 1 Strobh. Equity R. 393, 409. And where an administrator neglects to settle or pay, and is sued by creditors, or cited by heirs, and employs counsel to defend him, his counsel fees are not allowed.—Sterrett's Appeal, 2 Penn. 420 ; 2 Williams' Ex'rs, 1141, note 1 ; North's Probate Court, 171. And according to the decisions of our own court, to entitle him to credit for counsel fees, he should show that the services were required, the litigation necessary and *bona fide* for the benefit and demanded by the necessities of the estate.—9 Ala. 900 ; *ib.* 737 ; 16 *ib.* 286 ; 8 *ib.* 799. The suit in chancery was against the legatees, for the personal benefit of the administrator, and not demanded by the necessities of the estate, or in-

tended for its benefit. The bill, too, was dismissed on demurrer, and the administrator taxed with costs *de bonis propriis.* 12 Ala. 58. The contest in the Probate Court was between the administrator and legatees, and the latter succeeded in reducing his credits by $297 11, as the account shows. It is not only contrary to law, but to reason and justice, that legatees should be made to pay him for resisting their endeavors to extort from him their legacies, and for expenditures of their money for his personal benefit. The probate judge endeavored to compromise the difference between the legatees and administrator, by allowing him credits for half the counsel fees paid for prosecuting the chancery suit and maintaining his account on final settlement, and all the costs of the chancery suit. But, we can conceive of no mode of reasoning, consistent with law, equity or common sense, by which any compensation to the attorneys in either court, or the costs of the chancery suit, should be allowed. It is paying the administrator for abusing his trust, wasting the assets, and wronging the legatees. The only testimony in support of the counsel fees and costs in chancery, was that of one of the solicitors employed by the administrator, that he "had in good faith advised the filing of said bill;" whether for the benefit of the estate, the deponent saith not.

The allowance of commissions at $2\frac{1}{2}$ per cent. for payments to B. T. Moore for collecting the debts due the estate, by the same rule of compromise, is equally indefensible. It appears that he was the brother and partner in the practice of law of the administrator; but he *alone* collects all the debts due the estate—amounting to near $7,000—without suing for more than $740 thereof, and without going out of the county, so far as appears from the evidence, without any effort other than filing two or three writs that never passed into the sheriff's hands and never were filed in court. There was no proof that his services were *necessary*, or that the administrator could not collect in the same manner. The general rule is, that he must collect the debts himself.—2 Williams' Ex'rs 1140. There was no evidence offered in support of the credits for counsel fees on the final settlement.

3. It is admitted as a general rule, that an administrator is entitled to the court costs attending his administration, as well as costs of suits instituted by or against him, as administrator.

But it must be *bona fide* litigation, (9 Ala. 737,) such as he was led into by the necessities or interests of the estate.—16 Ala. 228. Costs should not be allowed, where he misbehaves, or is negligent.—2 Lomax on Ex'rs 501; 2 Wms. on Ex'rs 1253; 16 Ala. 228. Or where his misconduct is the sole cause of litigation (2 Wms. on Ex'rs 1255); or where he necessarily protracts controversy.—8 Ala. 805. Does not the record fully sustain the objection to allowing the administrator costs, made before the probate judge? Does it not show misbehavior, negligence and needless litigation, unnecessarily protracted?—by the numerous citations and the rule *nisi* for an attachment served on him to compel a settlement; by his appeal to the Chancellor to restrain the legatees from compelling him to settle; by neglecting to ascertain the names of those entitled to distribution (as he admits he might have done, in his own bill for injunction); by not filing a list of the distributees till the day of the decree against him for distribution, although advised by the affidavit of his predecessor, the first administrator, and by the petition of the distributees filed years before his final settlement (as is shown in his bill for injunction), who they were; by deferring even a partial settlement and distribution, and never coming to a settlement until compelled nearly five years after the grant of letters to him; by paying his brother and partner in the practice of law five per cent. commissions for collecting in the same county with him, without suit, nearly all the debts and distributable assets of the estate; by wasting the assets in needless litigation; by imposing on the counsel of said legatees the task devolved on him by law of procuring a list of the heirs, and never filing a list of the heirs till the very day of settlement; by filing an account that does not in many items distinguish the principal and interest collected, or show when collected, and that disables the legatees from learning when and how the moneys were paid him. At all events, costs for citations, the rule *nisi*, and the cost in chancery, should not have been allowed. It was like paying him for his delinquencies.

4. Executors and administrators are entitled to just and reasonable compensation; but what that is, depends on the circumstances of each particular case.—7 Ala. 617; 9 Porter 667. Compensation may be refused in cases of wilful default or gross negligence, causing loss to the estate.—10 Ala. 914.

We think there is abundant proof of such default, negligence and injury to the estate in this record, as above set forth.

5. *Primâ fâcie*, an administrator is chargeable with interest. He may discharge himself, " on making his returns to court," by expressly denying, on oath, that he has applied the funds of the estate to his own use.—Clay's Dig. 198 § 28. The reason why he should make the oath " on making his returns," is, that distributees may have notice and come prepared to contest its truth. But, when allowed to make the oath pending the contest, they are surprised and unprepared. But, notwithstanding he make the oath, he should be charged with interest, when guilty of *laches*.—10 Ala. 914. His first duty is, to be ready with his accounts, and neglect in this respect is good ground for charging him with interest.—1 Jac. & W. 140. So, when guilty of such acts of negligence or wrong administration as will disappoint claimants and dissipate assets.—10 Yerger 160. The statute was not intended to protect an administrator in resisting a settlement of his accounts for years and keeping the money of the estate lying idle all the time—by swearing he did not use it. Such is this case, as the account will show; although interest is charged on some items up to a few months before settlement—on the larger number and those of largest amount, no interest is charged for years before settlement.

6. The Probate Court distributed the legacies to Isaac Bendall, Sally Anderson and Barbary Jones (all of whom died in testator's lifetime) as *lapsed* legacies. The will clearly shows, that the testator intended that they should not lapse, but that in case any brother or sister died, his or her children should have his or her share. That such was his intention, is shown by his giving one-sixth of his property to Polly Zills, daughter of Elizabeth Zills, his sister, who died before the execution of his will, and by his carefully embracing the heirs of each living brother and sister in the respective items in which he bestows legacies on such brother and sister. He says . " I give to my brother, Isaac Bendall, one-sixth part of the net proceeds of my estate in money, " to him and his heirs forever ;" to my sister, Sally Anderson, " one-sixth part to her and her heirs forever;" to my sister, Barbary Jones, " one-sixth part to her and her bodily heirs forever." He manifests a purpose to divide his estate equally among his brothers and sisters, or their lineal

representatives, according to our statute of distributions. He makes an exception in favor of Isaac Bendall's children by his first wife, given them an equal share with any brother or sister; probably, from extraordinary affection for them, or the apprehension that what he gave his brother would go to his younger children by a second wife, to the exclusion of the others, through her influence. Even this exception shows his intention that the children of each brother and sister should enjoy his or her share of his property. Then, in the 13th item, he says: "The net proceeds, after making a complete settlement, is to be equally divided between my heirs heretofore named in the six separate divisions, by my executors." There can be no doubt that he never intended any legacy to lapse, but that the children of each brother and sister (who might die) should receive their deceased parent's share. By this construction, the property of the entire estate will be distributed as it would have been if there had been no will, (except the one-sixth given Isaac Bendall's children by his first wife), and thus the intention of the testator made to harmonize with the law in case of intestacy. Again; by this construction equality and justice will be maintained; while, by that of the probate judge, the fortunate children of those parents, who survived the testator, not only receive their parent's share, but divide with the children of parents, who died before the testator, their parent's share.

The intention of testator is the law of devises; the will must be favorably and benignly expounded to carry out, if possible, the intention; and so rigidly is this rule enforced, that intention will sometimes prevail against the literal meaning of the words, and courts will even supply or reject words; and the general rule, that a legacy to one, who dies before testator, lapses, may be controlled by the manifest intention of the testator, that the legacy shall not lapse.—Ram on Wills 1, (8 Law Lib.); 2 Williams on Ex'rs, 794, 760; 8 Port. 197. The intention is gathered from the whole will, and the intention of one devise may be explained by another devise in the same will.—Ram on Wills 93; Cook et al. v. Holmes, 11 Mass. 528; 8 Port. 387; 21 Ala. 466.

BRICKELL & CABANISS, *contra.*

ALABAMA.

LIGON, J.—On the settlement of the estate of Jesse Bendall, deceased, as appears by a bill of exceptions in this record, the legatees took several exceptions to the ruling of the court in relation to items of the account current of the administrator with the will annexed, as it was stated and allowed by the court. These exceptions we will consider as they are presented by the record.

1. From this it appears, that the administrator presented three receipts as vouchers of expenditure by him for and on account of the estate of his testator, which were objected to by the legatees. As the principle upon which these vouchers stand is the same, we will consider them together. They all relate to a box tomb of marble, lettered and inscribed, which the administrator caused to be erected over the grave of the deceased. The whole expenditure for this purpose amounted to $210 88. This expenditure may well be classed under the head of funeral expenses, and its allowance or disallowance must depend greatly upon the value of the estate, and the desire of the deceased in reference to his interment, if such desire was made known by him before his death; and it would make no difference whether this desire was included in his will, or orally imparted to those around him.

The principal inquiry should be, is the expenditure for this purpose disproportioned to the means of the estate, or injurious to the interests of the creditors and family of the deceased? Whenever it is ascertained that the estate could well afford the expense, without materially affecting its funds, or injuriously affecting the interests of creditors, or of those who are to take and enjoy it after the death of the testator or intestate, there is no impropriety in allowing the administrator a credit for such expenditure.

In this case it is shown, that the estate in the hands of the administrator amounted to nearly eight thousand dollars; that there were but few, and these very inconsiderable, debts existing against the deceased, and neither widow nor children to be provided for. The estate is bequeathed to collateral relations; and the deceased expressed a desire that his remains should be deposited in a marble vault. Under these circumstances, the administrator might well esteem it his duty to make the expenditure which he has made, and there was no error in allowing him a credit for the sum so expended.

2. The two next exceptions refer to the allowance by the court of the sum of $114 67, the amount paid by the administrator to two solicitors, and the register in chancery for fees, in a certain suit in the Chancery Court commenced by the administrator against the legatees of the estate, in which the bill was dismissed by the Chancellor on general demurrer.

The facts disclosed by the record in relation to these items are as follows : The legatees of the estate applied for, and obtained from the Court of Probate, an order for citation to the administrator to show cause why he should not make a partial settlement of his administration. This citation was served on him, but he failed to appear. A second citation was issued, served, and disregarded by the administrator. On the return of the second citation, and failure of the administrator to appear and obey its mandate, the counsel of the legatees applied for and obtained a rule against him to show cause why he should not be attached for contempt. This rule was served upon him, and before final action was had upon it, he filed his bill in chancery, and obtained an injunction restraining all further proceedings in the Orphans' Court, in reference to the settlement of the estate, until the matters of the bill were heard and determined by the Chancellor. This injunction was granted by a circuit court judge.

The gravamen of the bill was, that the administrator was not prepared to make settlement with the Court of Probate, because he had not yet ascertained who were the parties in interest under the will of Jesse Bendall, deceased, or their places of residence, so as to enable him to bring them before the Probate Court in the manner required by the statute ; but he admits that he had not used all the diligence which he could have used to accomplish this object. When this bill was filed, he had been in the office of administrator for the term of four years.

It is perfectly apparent from this, that the interest of the estate did not demand the filing of this bill, nor could it advance that of the legatees. We think it clear, that an administrator, in all litigation concerning the estate in his hands the tendency of which is to advance its interest, or to protect it from injury, is entitled to counsel at the expense of such estate. But we are unable to find any warrant in law to grant him this, when he engages in useless, unnecessary, or vexatious litigation

concerning the estate in his hands, and more especially when such litigation is with those who are lawfully entitled to the funds he withholds.—9 Ala. R. 900 ; 8 *ib.* 286 ; 7 Barr's (Penn.) R. 455.

For these reasons, our opinion is, the Probate Court erred in allowing the administrator a credit for any sum on account either of solicitor's fees or cost in the suit in chancery.

3. The next item in the administrator's account, to the allowance of which exception was taken in the court below, is the sum of $172 81, commissions paid to B. T. Moore, an attorney at law, for collecting $6884 42 of debts due to the estate from various individuals. The bill of exceptions sets out some proof in relation to this item, but does not state that what is thus set out is all that was offerred in reference to it in the court below. We have repeatedly held, that, when the bill of exceptions does not clearly show error, all fair deductions and inferences will be indulged by this court, in favor of the correctness of the judgment of the inferior court.

Bearing in mind this wise and well settled rule, we will proceed to examine the proof set out in the bill of exceptions, so far as it relates to this assignment of error. The only witness examined in reference to it is B. T. Moore, the attorney to whom the money was paid. He deposes, that he was the law-partner of the administrator ; that the notes, amounting to $6884 42, when past due and unpaid, were handed over to him for collection ; that suits were regularly instituted on two of them, and the money collected in due course of law ; that against three others of the debtors writs were filled up, but the cases were never docketed in court, nor the writs in the hands of the sheriff; that the money in these instances, and in all those in which no process was issued, was paid to him by the debtors, and by him paid over to the administrator, less 5 per cent., the usual collecting fee. The bill of exceptions does not negative the idea, that the fact of placing the notes in the hands of the attorney, while it rendered him responsible for all loss which might result from his negligence or want of skill, also tended to hasten the payment on the part of the debtors ; for it is notorious, that notes in the hands of an attorney, who threatens to sue upon them, are generally more promptly and readily paid than when they remain in the hands of the creditor. It

may also be true, that the attorney put himself to both trouble and expense, to see the debtors and make the collections. There is nothing in the bill of exceptions to negative this; and without all the proof upon the subject, we are unwilling to disturb the judgment of the court below.

The mere fact that the administrator and B. T. Moore were law partners at the time, which is so prominently set out in the bill of exceptions, and in the argument of the attorney for the plaintiff in error, is wholly without weight in considering the propriety of this allowance. We have already decided, upon full consideration, that allowances of this character may well be made to the administrator himself, if he be an attorney, and as such renders necessary legal services to the estate; the judge of the Probate Court deciding upon the propriety and reasonableness of the charges.—Harriss v. Martin, 9 Ala. R. 895. It would seem to follow from this, that there would be no impropriety whatever in the employment of the law partner of the administrator to render legal services for the estate, and in paying him a just and reasonable compensation for such services when rendered.

For these reasons, we are persuaded, that there is no error in the ruling of the court below in respect to this item of the account prejudicial to the rights of the plaintiffs in error, or of which they can justly complain.

4. On the final settlement of the court below, the administrator procured the services of two attorneys to attend to it on his part, to whom, according to his own statement of the account, be paid $150 each. To this item objection was made by the legatees, and the court reduced it one half.

We cannot say that this was error. Many items of the account, as it was rendered by the administrator, had been assailed by the legatees, and on some of them, as we have seen, the exceptions were not well taken. Under these circumstances, we think, the administrator was entitled to counsel for his own protection in the rightful discharge of the duties of his trust; and in such cases, it is not improper to charge the trust fund with the payment of fair and reasonable fees.

We cannot undertake to lay down a particular rule on this subject, which should govern the action of primary courts in every case. Much must necessarily be left to the sound dis-

cretion of those courts, both in relation to the *necessity* for counsel, and *the fees* which should be allowed to them ; and on both these points those courts must look to the circumstances of each case, and decide accordingly. For, while the law delights to protect an honest and faithful trustee, and will shield him from the attempts of beneficiaries to charge him wrongfully, it will not, on the other hand, allow a faithless one to use the money of the trust to aid him in carrying on an unnecessary and vexatious litigation with the *cestui que trust*, arising out of his own bad faith in the use and management of the trust fund.— 7 Barr 455 ; 1 Strob. Eq. R. 393.

The primary court should also be careful, to see that no greater number of attorneys should be employed than the necessity of the defence of the administrator or other trustee may demand. If several are employed, and separate fees charged and paid, when the court is satisfied that a less number would have been sufficient, the charge for all who are supernumerary should be disallowed ; and an amount which would be a fair compensation for his necessary defence should be allowed to the trustee out of the trust fund.

5. The next exception is to the commissions allowed to the administrator for the management of the estate. The sum so allowed is five per cent. on the amount of cash which came to his hands.

The rule laid down in the case of Powell v. Powell, 10 Ala. R. 900, in relation to the allowance of commissions to a reasonable extent to executors and administrators, we believe to be the true one, and such allowance should never be refused, " except in cases of wilful default, or gross negligence, of which loss to the estate has been the consequence." Nothing of that kind has been made to appear by this record, or is even insisted upon in argument. The continuances of the settlement, we must suppose, were granted for sufficient reasons ; and the record is silent, in most instances, as to the party applying for them. To grant or refuse them was within the discretion of the court below, and cannot be reviewed by us ; nor can we look to them on the question of wilful default or gross negligence resulting in loss to the estate, for which alone the administrator would forfeit his right to compensation. The sum allowed is that usually given in such cases, and there was no error in making the allowance to him.

6. The next exception relates to the refusal of the court to charge the administrator with interest on the funds in his hands.

The record shows, that the administrator, on the day of the final settlement, filed the affidavit required by the statute, (Clay's Dig. 198 § 28,) the effect of which is to discharge him from the payment of such interest. The plaintiffs in error do not contest the sufficiency of the affidavit made by the administrator; but it is urged that the court erred in permitting it to be made at the time of the final settlement, as it did not allow them time to inquire into its truth, that they might decide whether they would controvert it.

By the second section of the act of 1843 (Clay's Dig. 229 § 42), the judges of the Probate Court are required to examine the accounts and vouchers of administrators on the day appointed for settlement, and state the same, when all exceptions may be taken and heard.—Steele v. Knox, 10 Ala. R. 608. It appears to us, that this would also be the proper time for the administrator to discharge himself from accounting for interest, if he has not used the funds of the estate. The language of the statute above referred to (Clay's Dig. 198 § 28), that "in making their return to the court, they shall expressly deny on oath," &c., is merely directory, and would not prevent the making of the oath, when the account is made up and stated by the court. If the legatees were taken by surprise by the making of the affidavit, and desired time to examine into the facts, with the view of raising an issue upon it, the court should continue the cause for that purpose. No suggestion of the kind seems to have been made in this case, and no denial was offered at the time the oath was made. Under these circumstances, it was not error for the court to act upon it, and the result of that action is in strict conformity to the requisitions of the statute.

7. The legatees objected to the manner in which the debit side of the account was stated, because no interest seemed to be charged on some items, and on others the principal and interest are so blended together that it is impracticable to separate them, or distinguish between them; and the account, as stated by the court, is exhibited to establish the facts relied on.

We have already said, that, under the act of 1843, it is the duty of the Probate Court to state the account between the administrator and the estate of which he has charge, at the

time of the final settlement. The account thus stated is the act of the court, and is the result of evidence furnished by the administrator and the parties in interest who contest the accuracy of the return of the administrator, or the legal sufficiency of the vouchers and proof presented by him. To enable this court to review the account thus stated by the court, and to decide upon the correctness of its items, it is indispensable that the bill of exceptions should set out the proof which was before the court below with respect to each item, and which controlled its action in respect to them. This is not done in the present record, and in its absence we must presume in favor of the correctness of the judgment below, and in this respect affirm it here.

8. The next and last assignment of error arises out of the final decree of the court below. It appears, that Isaac Bendall, Sally Anderson, and Barbary Jones, three of the legatees under the will of Jesse Bendall, died before the testator. The court below decided, that the legacies to them had lapsed, and proceeded to distribute them among the heirs at law of the testator, as in case of intestacy.

The language of the will making the bequest to Mrs. Anderson is : " I give to my sister, Sally Anderson, one sixth part of the net proceeds, that is not given away in this will to others, after my sale, to be paid her by my executors hereinafter mentioned, to her and her heirs forever."

The words " of my estate," after the words " net proceeds," will be supplied by the court, as, from the other clauses of the will, they were evidently intended to be used by the testator. The legacy of one-sixth part of his estate is given to five other legatees, including Isaac Bendall and Barbary Jones, in the same language used in the bequest to Mrs. Anderson, except that the words "of my estate" are used in these clauses of the will, and omitted in that which gives the legacy to her.

It is, therefore, too clear to admit of any other construction, that the testator intended the legatees named in his will should take their several bequests in their own absolute right, so that their children have no claim whatever under the will. It is clear, also, that the specific legacies to the three legatees, who died before the testator, became lapsed legacies ; and the general rule in such cases is, that if the will contain a general resid-

uary clause, which is the case here, the specific legacies which have lapsed fall into the residuum, and pass to the residuary legatees.

But in the present case, we are met by this difficulty: the same persons who are the specific legatees, are also the residuary ones, and are each entitled to one sixth of such residuum.

The rule is well settled, that where one of several residuary legatees, who are to take in common, dies before the testator, his portion does not survive to his co-legatees, but goes to the next of kin according to the statute of distribution.—1 Roper on Legacies, 340 ; Peat v. Chapman, 1 Vesey, Sr., 541 ; Bagwell v. Dry, 1 Pr. Wms. 700 ; Owen v. Owen, 1 Atk. 494.

The case of Page v. Page, 2 Pr. Wms. 488, is nearly identical with the present. There the bequest of the residue of the personal estate was to six persons, to each of them a sixth part; one of them died before the testator. The Lord Chancellor said, " This is a lapsed legacy as to one sixth, and undisposed of by the will, the residuary legatees being tenants in common, and not joint tenants ; and, therefore, the legacy shall not survive, but go to the testator's next of kin, according to the statute of distribution."

This case has been constantly followed in the English courts, except in the case of Hunt v. Barkly, in which Sir Joseph Jekyll, Master of the Rolls, held differently. But this latter case is cited and repudiated by the Lord Chancellor in Owen v. Owen, *supra*.

We think, therefore, the court below did not err in disposing of the legacies of Isaac Bendall, Sally Anderson, and Barbary Jones, as lapsed legacies to which the next of kin were entitled under the statute of distribution.

For the errors heretofore pointed out, the decree must be reversed, and the cause remanded.