Bates, adm'r &c. v. Vary, adm'r &c.

40   421
103  597

40   421
109  351

## BATES, ADM'R &C. *vs.* VARY, ADM'R &C.

[FINAL SETTLEMENT OF ACCOUNTS OF DECEASED ADMINISTRATOR.]

1. *Delivery essential to parol gift.*—Delivery, actual or constructive, is necessary to perfect a parol gift of a chattel, or of a chose in action; and where the delivery is constructive merely, the donor's intention to part with the title and dominion of the subject of the gift, in favor of the donee, must be clearly manifested.

2. *Payment of debts by executor or administrator.*—If an executor or administrator pays the debts of the decedent's estate, either with his own funds, or with the funds of the estate, the payment operates an extinguishment of the debts so paid, and entitles him to a credit, on final settlement, for the amount so paid ; but he may, for a valid consideration, waive his right to a credit or reimbursement for the moneys so paid, in favor of the distributees of the estate ; and in this case, his precedent declarations of his intention to use his own Confederate money in payment of the debts of the estate, for the benefit of the widow and children of the decedent, who was his brother, and his death-bed declarations that he had done so, were held sufficient to show such waiver on his part, and to deprive his personal representative, on final settlement of his administration, of the right to claim a credit for such payments.

3. *Retainer by executor or administrator.*—An executor or administrator, having paid debts as surety for the deceased in his life-time, may retain the amount so paid out of the trust funds which come into his hands, when the estate is solvent; and is entitled to a credit for such payments, on final settlement of his accounts.

4. *Compensation and commissions.*—The refusal of the probate court to allow commissions or compensation to a deceased administrator, on final settlement of his accounts by his personal representative, is, at most, error without injury, when the record shows that he was

allowed to retain in his hands, without accounting for, a sum larger than the commissions or compensation to which he would have been entitled.

5. *Allowance of counsel fees.*—To entitle an executor or administrator, on. final settlement of his accounts, to a credit for attorney's fees, he must show that he has paid them.

APPEAL from the Probate Court of Perry.

IN the matter of the final settlement of the accounts and vouchers of John H. Jones, deceased, as administrator of the estate of Robert H. Jones, deceased, by F. A. Bates, the administrator of said John H. Jones. Robert H. Jones died on the 11th October, 1864, and letters of administration on his estate were granted by said probate court, on the 18th November, 1864, to said John H. Jones, who was his brother; and on the 18th November, 1865, after the death of said John H. Jones, letters of administration *de bonis non* on the estate of the said Robert H. were duly granted to John F. Vary. On the 11th December, 1865, F. A. Bates was appointed administrator of the estate of said John H. Jones; and on the 12th January, 1866, he filed his accounts and vouchers for a final settlement of his intestate's administration on the estate of said Robert H. Jones. Objections to the allowance of various items in the account, as stated, were filed on the part of the distributees and the administrator *de bonis non ;* and the final settlement was had, after several continuances, on the 24th April, 1866. All the facts of the case are stated in the decree of the court, and in the bill of exceptions reserved on the hearing by said F. A. Bates.

The decree, after stating the various continuances, the appearances of the parties, &c., proceeds thus :

"A. McKellar testified, that soon after Dr. John H. Jones became administrator of the estate of Robert H. Jones, he told witness that he did not know whether the estate was solvent or not, and that he thought of selling the property of the estate right away, and settling up the estate; that at another time, afterwards, he told witness that he intended to pay the debts of the estate, and to let the widow and children have the benefit of it—that he would start them

Bates, adm'r &c. v. Vary, adm'r &c.

out of debt, and he thought they could then make a living; that at another time, still subsequent, he told witness that he did not see what better he could do with his Confederate money, than to pay the debts of the estate with it, and let the widow and children have the benefit of it; that he told witness, after the surrender, that he had paid all the debts of the estate he could with Confederate money, and that there were two debts where they would not take Confederate money—one in Mobile, and one in Marion.

"C. O. Jones testified, that J. H. Jones told him that he intended to pay all the debts of the estate he could with Confederate money, and let the widow and children have the benefit of it; that he told witness so several times; and that he often told witness that he intended to pay all the debts of the estate he could with Confederate money, and did not expect to get any thing for it; that (he) witness recollected distinctly one time, when he told witness that he was going to pay all the debts of the estate he could with his Confederate money, and did not expect to get any thing, and did not want any thing for it—that he regarded the money as worthless, or thought it would be worthless; that he advised witness to pay the debts of an estate which witness represented, with Confederate money, and offered to let him have all the money he wanted for that purpose, and told witness that he need not give him any note or showing for it, and if the money went up he need not ever pay him any thing for it; that in the winter of 1864-5 he told witness he had about eighty thousand dollars in Confederate money.

"T. D. Jones testified, that J. H. Jones told him he intended to pay, the debts of the estate, if he could, in Confederate money, and let the widow and children have the benefit of it; that he told witness so several times; and that after the surrender he told witness he had paid all the debts of the estate he could with Confederate money. Woolley testified, that J. H. Jones requested him to release him from a bond of about twenty-five thousand dollars which he had given on account of witness as overseer under the Confederate law; that he gave witness as a reason for making the request, that he would have to pay a good deal

on the bond, but he wanted to pay the debts of the estate, and give it to the widow and children; that witness complied with his request, and released him from the bond by going into the army of the Confederate States.

"Dr. J. F. Blevins testified, that he had a conversation with Dr. J. H. Jones, in which he referred to what some persons were saying about his paying the debts of the estate with his Confederate money, and said he did not care what others said or thought about it—he was going to pay all the debts he could with his Confederate money, and let the heirs have it. Mrs. Rachel Jones, the mother of Dr. J. H. Jones, testified that, after the surrender, and but a short time before his death, he told her that he had done all he could for them—that he had intended to educate the children, but now he could not do it; that he said he intended to give his property to her and his sister Harriet.

"Charles O. Jones testified, that he was present in the bed-room of Dr. J. H. Jones, a few hours before his death, in company with Mrs. Sallie E. Jones, widow of Robert H. Jones, deceased, and others; that Dr. Jones said to Mrs. Jones, that he had been accused of taking the estate of Robert for the purpose of speculation, 'But,' said he, 'you see what I have done—I have paid off all the debts of the estate, except about five thousand dollars, and that I could not pay with Confederate money; you must now look to some one else to take care of you.' A. Marshall testified, that he was present, also, at the same time referred to by Chas. O. Jones, and heard Dr. J. H. Jones say substantially the same as above; adding that he, Dr. Jones, said he had always regarded Mrs. Robert Jones as a sister.

"It was proved that Dr. J. H. Jones owned about eighteen hundred acres of black land, which is worth in present currency, at the time of this trial, from thirty to thirty-five dollars per acre; that in 1864, and up to the time of the surrender, he owned upwards of one hundred slaves; that he owned between thirty-five and forty mules, and several horses, between sixty and seventy head of cattle, some very fine and valuable blooded stock, over two hundred head of hogs; also, sheep and goats, farming utensils, &c., &c.; that he had, in 1864, one hundred bales of cotton, which

were still on hand. It was in proof, also, that Dr. J. H. Jones had neither wife nor child; that Robert was his youngest brother, and the last that died; and that Robert was his only brother who left a wife or any child surviving. It was in proof, also, that Mrs. Rachel Jones, the mother of Dr. J. H. Jones, lived in the county, about two miles from the town of Marion; that she had a son, named Thomas, who died in 1862, and who lived near her for several years previous to, and at the time of his death, their houses being separated only by a road passing between them; that the place at which Thomas lived was called the 'Wiley place', and after the death of Thomas belonged to Dr. J. H. Jones; that Robert was then living, with his family, at his own house, on his farm; and that Dr. J. H. Jones requested him to leave his own place, and move with his family to the said 'Wiley place', so as to be near his mother, and also to protect said place; and that Robert, at the request and solicitation of his brother John, did move with his family to the said 'Wiley place', in October, 1862, and lived there until his death, which took place about the 11th of October, 1864; that he left, him surviving, his wife, Mrs. Sallie E. Jones, and three children, viz., William, then about five years old, Ella, about two years old, and Elizabeth, an infant; that Robert had, at the time of his death, a farm of about eight hundred acres, which lay adjoining the land of his brother John, and was of about the same value per acre; that he had nine mules, about —— head of cattle, —— hogs, a dozen sheep and goats, about fifty-five bales of cotton, twenty-seven slaves, old and young, and farming utensils, &c., &c.; that his dwelling-house was about a half-mile from the dwelling-house of his brother John; that John had much affection for his brother Robert and his family, and also for his mother, Mrs. Rachel Jones, and for his sister Harriet, who was still unmarried and afflicted. It was in proof, also, that Dr. J. H. Jones did not, at the commencement of the year 1865, or at any time, hire out any of the negroes, or rent out any of the land; that he did not at any time sell any of the property of the estate to pay debts, or for any purpose; nor did it appear that he did at any time institute any proceedings

whatever for the sale of any property of the estate, for any purpose whatever; that as negroes were selling in January, 1865, for Confederate money, the negroes alone of the estate would have sold for, or were worth, about one hundred and fffty thousand dollars in Confederate money. It appeared that Dr. Jones died on or about the 2d day of September, 1865.

"From the foregoing testimony, it appears to the court that said J. H. Jones designed, intended, and determined, to pay the debts of the estate, or at least so much thereof as he could, with his Confederate money, as a gratuity for the benefit of the widow and children of his deceased brother Robert; that he did not sell, or institute any proceedings for the purpose of effecting a sale, of any of the property of the estate to pay debts, because he had designed, intended, and determined, to pay the debts of the estate with his own means, or with so much of his own means as might be necessary for that purpose, as such gratuity; that the course which he adopted and pursued, and all he did in reference to the estate, and in the management or administration thereof, was adopted, pursued, and done by him, under and in pursuance of said design, intention, and determination; and that all the payments of debts against the estate, which he made in his life-time, with his own means, were designed, intended and made by him, as such gratuity; and such payments having been made by him as such gratuity, the court holds and rules, that no claim or demand can now arise, or be allowed therein by the court, in favor of said J. H. Jones, or in favor of his estate, against the estate of Robert H. Jones. The money of the estate, which he received, and with which he is charged on the debit side of said account, was Confederate money; and the court considers that he paid out this Confederate money in the payment of debts; and being charged in said account with this Confederate money, he must be allowed a credit on the credit side of the account, equal to the amount of said debits. If commissions were to be allowed on these receipts and disbursements of Confederate money, then the real value of such Confederate money, in good and lawful money, must be ascertained, in order to fix the amount of

commissions; but, under the testimony, the court considers that he received and paid out this Confederate money under the same design, intention, and determination above mentioned; and that, therefore, this is not a case in which commissions can be allowed; and none will be allowed by the court in this case in favor of said J. H. Jones.

"In the above ruling of the court, all the debits, or items on the debit side of said account, and all the credits on the credit side thereof, from item No. 1, to item No. 50, inclusive, are embraced. In regard to items Nos. 49 and 50, being the rent of the 'Wiley place,' the court considers that, if J. H. Jones really set up any such claim for rent, he paid the same to himself, out of the funds which are shown by the debits entered in said account as having come to his hands. But, in regard to these two items, it appears to the court that R. H. Jones moved to the 'Wiley place' at the invitation and request of his brother John, so as to be near his aged'mother, and also so as to protect in some measure the said 'Wiley place;' and the court does not discover anything in the evidence, inducing the court to conclude that John expected to charge, or that his brother Robert expected to pay any rent therefor. It appears that in April, 1864, J. H. Jones gave Robert a note, or due bill, in consideration of bacon; but there is no evidence that Robert gave any note for the rent, or made any agreement, in writing, or verbally, to pay rent; nor that John made any charge against him for the rent. After the surrender, John stated that he had paid all the debts he could with Confederate money, and referred to the debts which remained unpaid because he could not pay them with Confederate money; but it does not appear that he included these items for rent among the unpaid debts. His statement to the witness McKellar, that he intended to pay the debts of the estate, and let the widow and children have the benefit of it, and that he would start them out of debt; of itself, in the opinion of the court, tends to show that he did not charge or claim any rent, and did not intend the estate to pay any rent therefor. Under the testimony, it appears to the court that, in this settlement, no claim can be allowed

to arise out of said items for rent, in favor of J. H. Jones
or his estate, against the estate of R. H. Jones.

"The administrator of J. H. Jones moves the court to
allow one thousand dollars for the fees of his attorneys, J.
H. Chapman, and Moore & Brooks, for professional ser-
vices rendered by them in this settlement. The court does
not question the propriety of the action of said adminis-
trator in the employment of counsel; and if such employ-
ment is proper, he certainly ought to be allowed such rea-
sonable fees as his attorneys may charge him for their ser-
vices. The services for which this fee of one thousand
dollars is charged, were rendered, chiefly, in the endeavor·
to establish a claim or demand in favor of the estate of J.
H. Jones, against the estate of R. H. Jones, arising out of
the matters above disposed of. These services, so far as
any such claim is concerned, were rendered entirely for the
benefit of the estate of J. H. Jones. The administrator,
Bates, may have had in view, in the employment of said
attorneys, his own protection, as well as the interests of
the estate he represents; and these services may have been
rendered, as well for his protection, as for the interests of
that estate. The court considers that, acting in a fiduciary
capacity, and in good faith, he is entitled to be protected.
But it must be at the expense of the estate for whose inter-
ests he is acting; and it appears to the court that the fees
for such services are properly chargeable against the estate
which he represents, and certainly not against the estate
of R. H. Jones. The said one thousand dollars, being item
No. 54, for said attorneys' fees, is therefore disallowed.

"The items No. 51, one hundred and eleven dollars for
bagging and rope; No. 52, two hundred and eleven 25–100
dollars for board of mules; No. 53, one hundred and seven-
teen dollars for fodder, are allowed by the court; and the
further sum of two hundred and ninety-five 50–100 dollars
for costs is also allowed, amounting in all to the sum of
seven hundred and thirty-four 75–000.

" And the court now proceeded to state said account, in
accordance with the foregoing testimony and rulings of
the court; whereupon, it appears to the court, that the deb-
its entered on the debit side of said account amount to the

sum of twenty-two thousand six hundred and forty 08–100 dollars, with which said J. H. Jones, administrator as aforesaid, is chargeable; that the credits entered from item No. 1 to item No. 45, inclusive, amount to the sum of thirty-eight thousand and nineteen 64–100 dollars, out of which said administrator is entitled to be, and he hereby is, allowed a credit of thirty-eight thousand and nineteen 64–100 dollars; leaving a balance of fifteen thousand, three hundred and seventy-nine 56–100 dollars; that said balance, having been paid by said J .H. Jones, as a gratuity, as heretofore shown, be, and the same is, hereby disallowed. It appears to the court, that the estate of R. H. Jones is indebted to the estate of J. H. Jones in the sum of seven hundred and thirty-four 75–100 dollars, now stated in said account, the same being the amount of said items numbered 51, 52, 53, and 55, on the credit side of said account, which are allowed by the court, as hereinafter appears; and it appearing to the court that said account, so stated as aforesaid, is correct and just, it is ordered, adjudged, and decreed by the court, that said account, so stated, be, and the same hereby is, passed and allowed, and that the same be recorded and filed."

"On the trial of the cause," as the bill of exceptions states, "it appeared in evidence that voucher No. 36 on the credit side of the account was a bill of exchange, drawn by Robert H. Jones, on the said John H. Jones, and by said John H. Jones accepted, dated January 6th, 1864, and payable ninety days after date, to the order of N. V. Wyatt. This bill was introduced in evidence. Said Wyatt, being introduced as a witness, testified that, a short time before the bill was given, Robert H. Jones called on him, at Marion, and asked him if he would lend him (Robert H. Jones) some money; and that he replied, that he would, if he would fix him up a good bill, which Jones said he would do. Wyatt further testified, that in a few days afterwards, Robert H. Jones brought him the bill above stated, and gave it to him for Confederate money, which he then lent to said Robert H. Jones; and that on the 22d July, 1864, said John H. Jones, the acceptor, paid to witness the sum of five thousand four hundred and sixty 85–100 dollars, the

27

amount of principal and interest due on said bill, in satisfaction thereof.

" Vouchers Nos. 37, 38, 39, 40, 41, 42, 43, 44, and 45, on the credit side of said account, were shown to be for just debts owing by Robert H. Jones at the time of his death, to his mother, Rachel M. Jones. Six of said debts were in promissory notes executed by said R. H. Jones, and payable to R. M. Jones, and the others by account, some of which were contracted before, and some after the State seceded. The notes and accounts had receipts on them signed by said Rachel M. Jones, bearing date the 28th March, 1865, whereby she acknowledged that she received payment of said debts from John H. Jones, administrator of Robert H. Jones, deceased. Mrs. Rachel M. Jones, the payee in said notes and owner of said debts, being introduced as a witness, testified, that said John H. Jones was her son and agent; and that on the 28th March, 1865, she signed said receipts and accounts at his request, and upon his promise to pay her; and that she looked to him, and not to the estate of Robert H. Jones, for payment; but that she had never been paid anything. On cross-examination by contestants, she further testified, that at the time she signed the said receipts, her son John did not pay any money over to her; that he kept all her money, notes, and papers, for her, and attended to her business; and that he did not give her any note, or obligation in writing to pay her the money, or showing that he owed her the money. On the rebutting examination she testified, that John died without having made any settlement between them.

" Squire Lowrey testified, in reference to voucher No. 38, which was a promissory note, that it was a note given for the debt of Robert H. Jones, and was signed by him, and by Mrs. R. M. Jones, as his surety; that Robert himself in his life-time paid the note, with interest, in Confederate money, the amount being fifteen hundred and ninety-three 87-100. Mrs. Rachel M. Jones testified, in regard to this note, that she furnished the money to Robert to pay the note; that she told John to let Robert have the money for her, with which to pay it, and that John did so; that Robert took the money, and went and paid the note, and then gave the

note to John, to keep for her, and as her showing for the money.

"It was proved that Messrs. Chapman, Moore, and Brooks, attorneys at law, were employed by F. A. Bates, the administrator in this case; that they duly and properly attended to the case, assisted in preparing the account and the cause for trial, and attended to the same, and advised and counselled the administrator in the matter, and that their services were reasonably worth the sum of two thousand dollars; and the said administrator claimed that the court should allow him one half of said sum as a credit upon his said account, and also claimed that commissions be allowed for the services of his intestate, as administrator, &c.

"The foregoing, together with the testimony mentioned in the decree, is in substance all the material testimony in the cause; and the said F. A. Bates excepts to the decree of the court."

The final decree of the court, and its rulings on the several matters covered by the objections above specified, are now assigned as error.

W. M. BROOKS, and J. H. CHAPMAN, for appellant.
VARY & JOHNSTON, contra.

BYRD, J.—The main question presented on this record is, whether the court below erred in refusing to decree in favor of the appellant a balance of over fifteen thousand dollars paid by his intestate on the debts of Robert H. Jones, deceased. And this may be solved by the discussion and decision of two other questions: 1st, was the payment of the debts of Robert H. Jones, deceased, by appellant's intestate, under the facts and the law, a gift to the distributees of the estate of said Robert H.; or, 2d, was such payment a valid waiver of the right of appellant's intestate to be subrogated to the rights of the respective creditors, or to claim a credit for the amount paid them on a settlement of the estate?

1. All the authorities are harmonious in holding, that delivery is essential to the validity and consummation of a

parol gift of a chattel or *chose in action.*   But some hold, that an *actual delivery* is necessary, and others that the delivery may be *actual* or *constructive.*   Chancellor Kent says : "It must be an actual delivery, so far as the subject is capable of delivery.   It must be *secundum subjectam materiam,* and be the true and effectual way of obtaining the command and dominion of the subject.   If the thing be not capable of actual delivery, there must be some act equivalent to it. The donor must part, not only with the possession, but with the dominion of the property."   This, perhaps, may be as clear an exposition of the essential elements of the rule, as could well be expressed in so few words.   That rule, in its condensed form, may be thus stated, *"delivery is essential to perfect a parol gift of a chattel";* and may be said, in this form, to be *universal.*   It has often been found difficult of application, and adjudications have been made which are conflicting and irreconcilable.   These we shall not attempt to review, but will follow what we conceive to be the current of authority and the decisions of this court.   There is an apparent conflict between some of the cases decided by this court, as to the terms of the rule and its application, which we will proceed to notice briefly.

In the case of *Sims v. Sims' Adm'r,* (8 Porter, 449,) the court held, that delivery of possession is an essential ingredient in a gift of personal property, but that a change *of possession* is not indispensable; and the court was cautious to say, that it was not called upon to determine "what facts or circumstances would, in law, amount to a delivery of personal property, so as to consummate a gift."   There is no difficulty in stating facts which would constitute a valid gift of personal property; but no one, perhaps, can lay down any general or universal rule on the subject, which can solve without a doubt or difficulty every case that may arise in the current of human affairs.

The case of *Sims v. Sims' Adm'r* came before this court again, (2 Ala. Rep. 117,) and Chief-Justice COLLIER, in announcing the opinion of the court, changes the phraseology used in the former opinion, and says, "that it is essential to a parol gift of a chattel that there should be an *actual* delivery of the thing"; and ORMOND, J., who delivered the

opinion in 8 Porter, 449, adheres thereto, and dissents from the opinion of Chief-Justice COLLIER. GOLDTHWAITE, J. neither assents to, or dissents from, the opinions of the other judges, but puts his decision of the case upon the ground, "that the dominion of the father was never divested"; but it is to be observed, that, in his opinion, he uses the word "delivery," and not the terms "actual delivery",—in this respect following ORMOND, J. The dissenting opinion of the latter is a very lucid and satisfactory exposition of the law; as is also that of Handy, J., in the case of *Mc Willie v. Van Vacter and Wife*, 35 Miss. R. (6 Geo.) 450.

In the case of *Durett v. Seawell*, (2 Ala. R. 669,) COLLIER, C. J., again uses the terms "actually delivered" in the same connection. In the case of *Pope v. Randolph*, (13 Ala. 221,) DARGAN, J., in the opinion of the court, uses this language : "If the donor parts with the possession of the chattel itself, for the purposes of the gift, it is sufficient; for this is the only delivery that can be made of the subject of the gift." This was said in reference to a gift of the hire or use of slaves. It is also said that, "to divest the title of the donor, he must deliver possession of the chattel to the donee, or some one for the donee"; thus, in language and spirit, following the opinions of ORMOND, J., *supra*.

In the case of *Jones, adm'r, v. Dyer and Wife*, (16 Ala. 224,) COLLIER, C. J., says, in delivering the opinion of the court, "that it is indispensable to a parol gift of a chattel that there should be an *actual* delivery of the thing," following his former opinions; but he impliedly qualifies the rule thus broadly laid down, by saying, "To constitute an effectual delivery, the donor must part with the dominion of the thing, in favor of the donee."

In the case of *Stallings v. Finch*, (25 Ala. 522,) GOLDTHWAITE, J., in delivering the opinion of the court, says : "It is indispensable to the validity of a parol gift of a chattel, that the owner should part with his dominion over it."

In the case of *Gillespie's Adm'r v. Burleson*, (28 Ala. 551,) WALKER, J., in announcing the opinion of the court, says : "While delivery is a necessary constituent of a parol gift,

it is not indispensable that it should be simultaneous with the words of conveyance."

The word *delivery* is more comprehensive than the terms "actual delivery." A delivery may be actual, or it may be constructive, or symbolical; and we see no reason why the constructive delivery of a chattel or *chose in action*, accompanied with appropriate words of conveyance by way of a gift, would not be effectual to pass the title to the donee, where the donor parts with his dominion over the thing thus delivered.

In the case of *Carradine v. Collins*, (7 S. & M. 428,) that learned jurist, Chief-Justice Sharkey, in delivering the opinion of the court, says: "As between donor and donee, the gift of a chattel is incomplete without delivery, or some act equivalent to delivery, if at the time the thing be susceptible of transmission. We do not say that actual delivery is necessary; it may be constructive, or symbolical; * * * delivery, actual or constructive, is necessary."—10 John. R. 294; 1 N. & McC.. 224, 592; 4 B. Mon. 535.

After a careful consideration of the many cases decided, and authors who have written upon this subject, we conceive that the true rule may be thus stated: *delivery, actual or constructive, is essential to the validity or consummation of a parol gift of a chattel; and where the delivery is constructive, it must clearly appear that the donor has parted with his dominion over the thing, in order to pass the title to the donee and effectuate the gift.*

The two leading adjudications brought to our attention by counsel, as applicable to the facts of this case, as to the mode or nature of the delivery of personal property essential to the consummation of a parol gift, are to be found in 10 John. R. 294, and 4 B. Mon. 535.

In the former case it appears, that a father bought a lottery-ticket, and wrote the name of his daughter on it, and afterward it drew a prize of five thousand dollars, which was paid to the father; soon after the prize was drawn, he said "that the ticket did not belong to him—that he had given it to his daughter"; and this he said at various times. At one time it was said in the family, that the daughter ought to divide with the other children, and the

father replied, "No, she should not divide it; the ticket was her own, and the prize-money belongs to her, and she shall have the whole of it, and I will put it in trade for her.' The daughter was about eight years· old when the prize was drawn, and lived with her father until she was married. In 1806, the mother reminded the father of the prize-money, and requested him to take care of it; and he replied, "You know the ticket was Eliza's,; the money is hers, and I have kept it in trade for her to a good profit; I will never take a shilling of it, or of the profit: she shall have it all." The father frequently had said, before and after she was of age, in her presence, that he had given the ticket to her, and endorsed her name on it, and that the money belonged to her. It did not appear that she ever had the actual possession of the ticket or the money. Upon this state of facts, the court say: "There can be no doubt that delivery of possession is necessary to constitute a valid gift"; and further, after stating the main facts in evidence as above substantially given, the court say, "They afforded reasonable ground for a jury to infer that all the formality necessary to make a valid gift had been complied with, and the right and title of the plaintiff to the money complete and vested." The record in that case expressly negatives the idea of an actual delivery of the ticket; therefore, the delivery spoken of by the court must have been a constructive one, which was thereby recognized as sufficient to pass the possession or title to the daughter.

In the latter case, a father was surety on a note for two of his natural sons. He repeatedly expressed much solicitude for their welfare, and his *intention* to "*give them a start*"—to assist them in their pecuniary affairs. The father afterward voluntarily paid the note; he was not even requested to pay the same by the creditor. He had an ample estate, and had a wife by whom he had several children; but said that his natural children *felt as near to him* as his legitimate ones; that he intended to die without a will, and on that account intended to help them during his life, as they would receive no portion of his estate after his death. Shortly after the payment of the note, he spoke of it as a gift to them, and said he intended to give them five

hundred dollars more; and he expressed a wish to see them, that he might give them the note, for fear, in the event of his death, they never would get it. They resided about seventy miles from him at the time, and never saw him after he paid the note. It was also in proof that, a considerable time prior to the payment of the note, he said he had given them all he intended to give them; and at his death the note was found among his other notes. Such were the material facts. The court, in passing an opinion upon them, say, "In this case, it is urged there was no delivery; but, in order to determine what delivery was requisite, it may be inquired in what the gift consisted. The payment of the money in discharge of the note, we think, constituted the gift. The act was complete when the money was paid, if paid, as we have assumed, as a gift. * * The donor had parted with the possession of *the thing*, and with all control and dominion over it; he could not recall the money paid, nor change the nature of the act. To render the gift perfect, it was not necessary to deliver the note to the donees. When paid, the note was *functus officio*. * * It was not the note, or the delivery, that constituted the gift, but its payment." And the court upheld the validity of the gift.

If these cases are to be taken and held as a proper application of the general rule on the subject of the delivery *essential* to the consummation of a parol gift of a chattel or a *chose in action*, they appear to us as persuasive, if not conclusive, to show the correctness of the decree of the probate court on this question, looking to all the facts contained in this record. Appellant's intestate, from the evidence, obviously intended to give the money he paid on the debts of his intestate, and not the debts themselves, or the evidence of them; and the declarations of Doctor Jones, as proved by the witnesses McKellar, Woolley, Charles O. Jones, and Doctor Blevins, show that the money was to be paid for the benefit of, and as a gift to the widow and children of Robert H. Jones, deceased; and certainly *was so paid*, if the declarations of Doctor Jones, on his death-bed, to his sister-in-law, referred to the facts proved by the witnesses, and were uttered in good faith, and in a sound con-

dition of mind; which we think is the proper version of this transaction. If not, what other sensible construction can be given to the evidence and those declarations?

2. But, however this may be, we will proceed to the consideration of the second branch of this main issue. The payment of a debt of any kind, by a party primarily bound to pay, or if a person not so bound voluntarily makes payment, is an extinguishment thereof.—*Wallace v. Br. Bank at Mobile*, 1 Ala. 565 ; *Kenan v. Holloway*, 16 Ala. 53 ; *Ross' Adm'r v. Pearson*, 21 Ala. 473 ; *Wray v. Cox*, 24 Ala. 337. If an administrator, who has assets sufficient of the intestate to pay debts, or who has not, voluntarily pays them out of his own funds, it is an extinguishment of them.—*Prater's Adm'r v. Stinson*, 26 Ala. 456. But, in such a case, he will be entitled to a credit for the amount paid, if the estate is solvent, on a settlement in the appropriate court ; or, if it be insolvent, he will be entitled to an allowance for money so paid, if the claim be filed and proved as required by law, and to receive thereupon a *pro-rata* share, with other creditors, of the assets of the estate.—*Hearin v. Savage*, 16 Ala. 286 ; *McNeill's Adm'r v. McNeill's Creditors*, 36 Ala. 109.

It is repugnant to the policy of the law to permit a trustee to pay or buy a debt which is payable out of the trust funds in his possession, and to hold as an assignee, with the right to assign it to another. Such a transaction would not only be violative of sound policy and principle, but would be subversive of the divine invocation, " lead us not into temptation." After payment by the trustee, the original debt must be treated as *functus officio*, unless for the purposes above indicated ; and if any action is maintainable, at law or in equity, it must be for the money so paid, and not on the original debt.

The reason of the rule is apparent, and it should be strictly enforced for the protection of the rights of all persons interested in the trust funds ; and especially where minors alone may be interested, who are incapable of having such transactions investigated while recent and susceptible of exposure. When, therefore, the administrator paid the debts of the intestate, they became, *ipso facto*, extin-

guished; and if they had been transferred to the widow 'and children, the transfer would have conferred no right of action on them, at least on the original debts. Whether the right to have money so paid refunded out of the assets of the estate, could be transferred by the administrator, so as to authorize the transferree to claim a decree for it on a settlement of the estate in the probate court, or to file a bill in equity to enforce the assignment and the payment of the money, we will not decide, as the question is not presented by the record.

But a trustee, who pays off a debt chargeable upon the trust funds, out of his own means, may, for a sufficient consideration, waive his right to be subrogated to the *status* of the creditor, or to claim it as a credit on a settlement of the trust. In our opinion, it is clear from the proof that Dr. Jones did not give, or intend to give, the original debts paid by him, or, in other words, the evidence of those debts, to the widow and children of his intestate. But it is equally clear that Dr. Jones, for the love and affection he had for his brother's widow and children, waived his right to claim the money paid on said debts, and the evidence of said debts, as credits against the estate on a settlement thereof; and it is very perceptible how this would (as he frequently said) be "for the benefit of the widow and children." He, at least, placed himself in the situation of one who voluntarily pays the debt of another for the benefit of the debtor. It is true that the widow and children were not the debtors; but they were the persons who were the ultimate owners of the fund or property upon which the debts were chargeable, and the persons to be benefited by such payment; and the affection he bore them was the evident and manifest consideration for the waiver.

The facts satisfy us that he intended, and that he executed his intention, to pay the debts of his intestate in Confederate treasury-notes, for the benefit of the persons who alone could be benefited thereby; and that he intended to, and did, waive his right to be substituted to the rights of the creditors, or to claim the payment of the debts so paid as credits on a settlement of his administration of the estate.

The reasonable interpretation of what Dr. Jones said on his death-bed is, that he was alluding to declarations he had made to his sister-in-law, similar to those he so uniformly had made to the witnesses and to his mother, as proved by them ; and it would be doing injustice to the memory and character of the deceased, who seems to have been endowed with a generous and elevated disposition, to suppose that all he said were mere idle and loose declarations, and were only deceptive and delusive.   In that last conversation with his sister-in-law, he evidently referred to the fact that he had paid the debts of the estate, so far as he had paid them, in Confederate money, and conveyed the idea that he had done so for the benefit of herself and children, and not to speculate on them; which would nevertheless be the result, if those debts were allowed as credits on the settlement of his administration, and would make him do what he never intended.   And it may be due to the memory of Dr. Jones to say, that we see no evidence tending in the least to reflect on his character; but, on the contrary, his conduct and bearing, as shown by the record, distinguish him as a man of the highest integrity and the noblest sentiments.

4. The bill of exchange drawn by Robert H. Jones on John H. Jones, payable to Wyatt, and paid by John H. on the 22d July, 1864, was paid in the life-time of Robert H.; and John H. having been appointed his administrator in chief, it should, perhaps, more clearly appear than it does by the record, that John H. was the holder of the bill at the death of his intestate; for, *non constat*, he may have obtained it from the papers of his intestate, and both have died without cancelling it.   But, admitting that Robert H. never paid John H. the amount the latter paid Wyatt, still it appears by the account-current that John H., on the 1st July, 1864, received on a due-bill of J. H. Jones two thousand nine hundred and fifty-eight 70-100 dollars, and on the 1st October, 1864, he received the sum of six thousand three hundred and sixty-six 05-100 dollars, which sums were more than sufficient to re-imburse the amount he paid on said bill, and all other debts paid by him on account of said estate in that year; and under the facts we hold that

he so applied said funds as to discharge the amount so paid by him on said bill, as had a right to do, the estate being then solvent, as appears by the proof.

As to the debts formerly due to Mrs. Rachel Jones from Robert H. Jones, and which constitute a large part of the balance claimed by the appellant as administrator of John H. Jones deceased, as shown in the record, we have this to say, if those debts were never in fact, or in consideration of law, paid by John H. Jones to Mrs. Jones, then they should not have been allowed as credits on the settlement; and if they were so paid by him, we are satisfied that they were paid in Confederate money, and therefore come within the influence of the principles applicable to other debts so paid, as hereinbefore announced. The evidence satisfies us that they were so paid by Dr. Jones, and that he or his estate is responsible to Mrs. Jones. Her evidence seems to us conclusive on this point.

In every view, therefore, we take of the main question in this cause, we are of opinion that the court below did not commit any error of which appellant can complain.

4. Appellant's intestate having paid all the debts set forth in the account, in exoneration of the estate, and for the benefit of the distributees, except, perhaps, the bill of exchange paid Wyatt; and the account and record showing funds more than sufficient to pay any compensation and commissions to which appellant's intestate is entitled, and for *which funds* no decree has been rendered against appellant as administrator of John H. Jones, deceased, this court will not reverse the decree of the court below, because no commissions were allowed. At most, it is error without injury. John H. Jones received about fifteen thousand dollars in money, as appears by the account, more than the amount of the bill of exchange which he paid Wyatt, and surely this sum will more than cover his commissions and attorney's fees.

5. There can be no doubt about the right of trustees to employ counsel to advise and assist them in performance of the duties imposed by law and the trust. But such advice and assistance must be necessary to the protection of the trust estate, or for the benefit of the *cestuis que trust;*

or to protect the trustee against the unjust or wrongful claims or demands of the beneficiaries or others.   A trustee is not entitled to a credit, on a settlement, for such services, or the value of them, unless he shows payment. 2 Williams' Exrs. 1581, and note 1 ; *Bendall's Distributees v. Bendall's Adm'r*, 24 Ala. 295.

In the case of *Pinckard's Distributees v. Pinckard's Adm'r*, (24 Ala. 250,) it appears, at least inferentially, that the fees of counsel claimed as a credit were not paid, and the court allowed the credit ; and the case of *Bendall's Distributees v. Bendall's Adm'r*, *supra*, is the only authority cited to sustain the allowance.   But, in the latter case, it appears from the record that the fees had been paid by the administrator ; and it is therefore no authority to support an allowance for counsel fees which have not been paid.   It is an authority in point. to show that an administrator is entitled to counsel for his own protection in the rightful discharge of the duties of his trust, and that the trust fund is chargeable with fair and reasonable fees when paid by him.

When an administrator who is an attorney, performs professional services for the estate, not within the scope of his duties as administrator, and which were necessary and proper, he may very properly call upon the court to make an allowance for such services, as he is not allowed to contract with himself, and cannot properly receipt to himself.   This is an exception to the general rule above stated.

To allow an administrator a credit for professional or other services rendered by others for the estate, or himself as its representative, without having paid the person rendering them, or, at least, obtained a receipt therefor, would be opening a door to fraud and imposition, which the law is studious and careful in keeping closed to every temptation or opportunity to make any profit out of the trust for himself or others.   If the law were otherwise, an administrator might obtain a credit for the value of services rendered the estate by others, and never pay the parties entitled ; or if any thing, such portion as he might see proper to pay, or as he had contracted to pay before the credit was actually allowed, thereby giving him the advantage of any excess

that might be allowed over the sum contracted to be paid. Appellant had the right to employ counsel; but he was not entitled to an allowance for any part of the fee, without payment of the same; and the court did not, therefore, err in its ruling on this question.—See *Taylor et ux. v. Kilgore*, 33 Ala. 214; *Pearson v. Darrington*, 32 Ala. 227.

Having disposed of the assignments of error argued by counsel, it only remains for us to say, that there is no error in the record of which appellant can complain, and the decree of the probate court is affirmed.